[Cite as *Adkins v. Middletown*, 2025-Ohio-317.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


|                          |   |                          |
|--------------------------|---|--------------------------|
| DOUGLAS ADKINS,          | : |                          |
| Appellant,               | : | CASE NO. CA2024-02-024   |
|                          | : | O P I N I O N            |
| - vs -                   |   | 2/3/2025                 |
|                          | : |                          |
| CITY OF MIDDLETOWN,      | : |                          |
| Appellee.                | : |                          |


CIVIL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CV2022-05-0805


Freking Myers & Reul LLC, and Jon B. Allison and Paige E. Richardson, for appellant.

Schroeder, Maundrell, Barbiere & Powers, and Katherine L. Barbiere and Lawrence E. Barbiere, for appellee.


**BYRNE, J.**

{¶ 1} Douglas Adkins appeals from the decision of the Butler County Court of Common Pleas which granted summary judgment in favor of the City of Middletown on Adkins' age, sex, and race discrimination and retaliation claims. For the reasons described below, we affirm the summary judgment decision.

## I. Factual and Procedural Background

### A. Adkins' Complaint

{¶ 2}   In 2022, Adkins filed a complaint against Middletown in the Hamilton County Court of Common Pleas.  The complaint was subsequently transferred to the Butler County Court of Common Pleas.  In the complaint, Adkins alleged that in 2018, following a city council election, he became a "target" of a newly elected city council member, who was later identified by Adkins as Ami Vitori.  At the time, Adkins was Middletown's city manager.  Adkins alleged that Vitori believed that "older white males in leadership positions were a problem and should be removed" from power.  Adkins alleged that Vitori began interfering with the performance of his job duties and that when he "pushed back" he was subjected to "hostility and retaliation."  He also alleged he was subjected to "discriminatory treatment," including "false claims about his performance" and that he was terminated from his employment in November 2019 in retaliation for complaining.  He also alleged that, after his termination, the city council appointed a "significantly younger female" as acting City Manager.

{¶ 3}   Based on these factual allegations, Adkins asserted four claims against Middletown, all brought under R.C. Chapter 4112: (1) age discrimination, (2) sex discrimination, (3) race discrimination, and (4) retaliation.[1]

### B. Discovery

{¶ 4}   The parties conducted discovery, including depositions of Adkins and the five individuals who, when they previously served on city council, voted to terminate Adkins' employment.  Those five former city council members were Steve Bohannon, Talbott Moon, Joseph Mulligan, Larry Mulligan, and Ami Vitori.  At the time of Adkins'

---

1. Though Adkins refers to a "gender" discrimination claim, R.C. 4112.02(A) refers not to "gender" but to "sex."  We will therefore refer to this claim as a sex discrimination claim.

termination, Larry Mulligan was also the city's mayor.  Larry Mulligan and Joseph Mulligan are brothers.

{¶ 5}  Numerous documents were introduced as exhibits during the depositions. These exhibits included records related to the official proceedings of city council and email and text communications involving the relevant parties.

### C. Summary Judgment Evidence

{¶ 6}  The following is a description of the summary judgment evidence relevant to deciding this appeal.

### 1. Adkins' Employment

{¶ 7}  Adkins is a white male who was born in 1963.  He first began working for the City of Middletown in 2005.  In 2014, Middletown's city council promoted him to the position of city manager.

### 2. Adkins' Relationship with a Subordinate

{¶ 8}  In 2019, Adkins began a romantic relationship with Jennifer Ekey, a city employee who reported directly to Adkins.  According to Vitori, when Adkins was initially confronted by Larry Mulligan, Adkins falsely denied that he was in a relationship with Ekey.  It is undisputed that Adkins eventually voluntarily informed city council of his relationship with Ekey.  Council then elected to modify Ekey's reporting structure so that she would report to the law department, rather than to Adkins directly.

### 3. Homelessness and the Triple Moon Incident

{¶ 9}  In or around September 2019, while Adkins was on vacation, Middletown Police Chief Rodney Muterspaw was serving as acting city manager.  During Adkins' vacation, Chief Muterspaw posted a message on Facebook that stated that police could not protect citizens in downtown Middletown after dark due to issues with the local homeless population.

{¶ 10} Adkins was perturbed by this Facebook post and explained in his deposition that Chief Muterspaw's comments were "not a true statement." Adkins explained that Middletown had software that would generate a daily report indicating problem areas in the city where police were responding. Adkins believed that the data produced by this report did not corroborate the police chief's claims about homelessness in the city.

{¶ 11} Also while Adkins was on vacation, Vitori posted a message on Facebook about the homelessness issue in Middletown. She stated it was a "terrible problem" and asked that people appear at the next city council meeting and hold the city manager—that is, Adkins—accountable.

{¶ 12} After he returned from vacation, Adkins testified that he had a tense conversation with Chief Muterspaw. Adkins told Chief Muterspaw that his Facebook post had violated the City's social media policy. According to Adkins, Chief Muterspaw then informed him that he was going to retire.

{¶ 13} Adkins testified that at the next city council meeting, which occurred on October 1, 2019, about 100 people appeared and were "freaked out and scared about this horrible homeless problem." Council meeting minutes reflect that Adkins spoke at the meeting and addressed the homelessness issue. Adkins explained that the reason the homeless might be coming into Middletown was because there were only a limited number of shelters available in Butler County, one of which was located in Middletown. Adkins stated that being homeless or becoming homeless was not a crime and that the city was limited in what it could do to address the problem. Adkins suggested that the downtown business owners might want to consider establishing a special improvement district to fund additional security in the downtown area.

{¶ 14} The meeting minutes reflect that multiple residents, including business owners, addressed city council concerning the "new" homeless people who they were

encountering, and who were committing crimes and acting mentally unstable or aggressively in the downtown area.

{¶ 15} Of note, Heather Gibson and Renae Theiss spoke. Gibson stated that she was the owner of the Triple Moon coffee shop ("Triple Moon") and that she had a great relationship with the local homeless population. However, she said, a new group of homeless people had arrived who were mentally unstable, mean, and aggressive. Recently a homeless woman had defecated on the sidewalk near her business, and then entered the coffee shop and began panhandling. Gibson stated that customers and staff were afraid to come downtown. Her business, in which she had invested her life savings, was struggling.

{¶ 16} Theiss echoed Gibson's comments, and stated that the new homeless people were disrespectful, unpredictable, and aggressive. She had extreme concern for the safety of downtown businesses and residents. She stated that children that attended Midd State (a school) had been harassed, followed, and sexually propositioned by transient men. Multiple other citizens who spoke at the city council meeting shared anecdotes along the same lines as Gibson's and Theiss' comments.

{¶ 17} Adkins testified that prior to this city council meeting, he was unaware that city residents were "worked up" about the homelessness issue.

{¶ 18} On October 2, 2019, the day after the city council meeting, Adkins visited Triple Moon to get coffee on his way to work. There were about six or seven people in the café at the time. Theiss was working at the cash register. Adkins testified that he had a conversation with Theiss about the homelessness issue. Adkins admitted that his voice was raised during this conversation and that he used the "F" word. He described himself as "upset about the situation and the problem and the fact that, again, no one had said anything about this and the data didn't support it."

{¶ 19} Adkins' comments and demeanor were further detailed in a letter that Theiss sent to the city council following the exchange. In relevant part, Theiss stated:

> Doug Adkins entered Triple Moon Coffee, approached me at our register counter, and as I handed him his coffee, he said, very sternly, "how long has this been going on?!", in reference to the issues we've been having downtown with the influx of homeless/transient people, issues I myself spoke on at the council meeting the prior evening. He then proceeded to state very animatedly that he knew nothing about this problem until he read the post Chief made on the subject last week. He said that he was told Ami Vitori and the downtown business owners were "taking care of it", that he had no idea there were any problems going on. His demeanor was obviously angry and very uncharacteristic; I have interacted with Doug literally hundreds of times in Triple Moon and this was absolutely unlike anything [I] have ever seen from him. He was loudly and angrily proclaiming, in front of multiple customers in our establishment, that "now we have Channel 5 news telling people that Middletown is full of drug addicts, don't go to Middletown! How is THAT going to affect your businesses???!!". . .he repeatedly said, "I can't fucking fix the problems if nobody fucking tells [me] about them!" And "I could have fixed this in two weeks, if somebody had fucking told me!"
>
> Doug seemed to be, in my opinion, coming completely unhinged, his behavior incredibly inappropriate and unprofessional, and I base that opinion on the substantial amount of interaction I have had with him in Triple Moon over the last three years. He said several times, "I'M NOT MAD AT YOU! I JUST DON'T UNDERSTAND WHAT [sic] NOBODY FUCKING TOLD ME ABOUT THIS!" He proceeded to repeatedly deny that he had any knowledge of these problems prior to the current time, to curse and exclaim that he could have fixed it had he known before now.
>
> Several customers witnessed this display, and some of them left our [e]stablishment as a result. It was incredibly uncomfortable and embarrassing to be subjected to what felt like an ambush, publicly, by one of our city's leaders. I was initially reluctant to bring this to your attention, as I have no interest in being embroiled in any conflict or drama, but I feel strongly that this behavior was appalling and wholly unbecoming of a city manager, and needs to be promptly addressed.

{¶ 20} Adkins' outburst at Triple Moon was reported on local news outlets.

**4. Suspension and Termination**

{¶ 21} Five days later, on October 7, 2019, city council held a pre-disciplinary hearing in conjunction with the Triple Moon incident. The pre-disciplinary hearing was held during an executive session of city council, which the public could not attend. Adkins read a statement to the council at this executive session. Adkins' statement was introduced into the summary judgment record. In the statement, Adkins first discussed, at great length and in detail, his accomplishments while working for Middletown. Adkins also discussed the numerous difficulties the city and he had faced and overcome throughout his tenure.

{¶ 22} Adkins went on to state that he had recently been under tremendous pressure and subjected to harassment by Vitori. Adkins stated that under the City Charter, city council's role was to set policy, and that city council members were not to interfere in administrative departments. Adkins complained that "over the past several months" Vitori had "consistently challenged both the notion of a required majority of council to set my workload and the notion of staying out of operations." Adkins claimed that if he pushed back against Vitori he would be subject to an "onslaught of harassing emails" all hours of the night.

{¶ 23} Adkins stated that council was aware of Vitori's conduct towards him because "most of you" had made comments to him along the lines of "man, she's really on your ass this week" or "she really has it in for you." Adkins stated that council had not made any effort to "stop this abuse."

{¶ 24} Addressing the Triple Moon incident, Adkins told council that he learned that Vitori had been on social media encouraging people to come to the city council meeting and demand action from the city on the homelessness issue. Adkins stated that after

months of "harassment" by Vitori, the council meeting was a "public ambush" and was his "breaking point." He then acknowledged Theiss' description of his behavior in her letter and stated that while he may have changed a "couple words" in the letter, it was an accurate representation of what occurred at Triple Moon.

{¶ 25} Adkins suggested that Vitori was manufacturing a homelessness crisis in Middletown. He said this manufactured crisis was not factually supported and conflicted with Vitori's own financial interests as a business owner in the downtown area. He stated,

> I have to ask the question as to what strong motivation would [Vitori] still have to orchestrate these events. The only answer I can come up with is that she wanted to continue her barrage against me and saw this as an opportunity to drive me out of the position of City Manager completely.
>
> She succeeded in doing something that no one has been able to accomplish in 14+ years. She got under my skin and unnerved me. Given the work record I've gone through above, I can't believe that this is related to my work product. It must be more personal. **I can only speculate. Perhaps she doesn't like older white men. Perhaps she believes that people who need hearing aids are not qualified to run a city.**

(Emphasis added.)

{¶ 26} In concluding his statement to council, Adkins admitted that his behavior at Triple Moon was "unacceptable," but stated that if the council members wanted him to continue as city manager, then no written reprimand should be added to his employment file and city council should "respond to the media with a strong representation that this matter is resolved and that you have full confidence in my leadership and the direction of the city." He then stated that if city council wanted him "to stay," then "the harassment"— presumably by Vitori—"must stop as of this evening." He also complained that over the last two years "there has been no consensus among you on many items," leaving him uncertain how to proceed and with "no way to stay out of trouble." He also gave council

instructions on how to manage him:

> If you wish me to be working on a particular project or priority, then I need you all to discuss the matter and then let me know what the majority of you believe I should be working on. If you can't decide how to proceed as a group, then my only way to operate is to stop innovating, stop fixing, and keep looking backward to make sure the five of you are not unhappy with my performance at all times.

Finally, Adkins gave the council an ultimatum with three options: either allow him to stay on as city manager until retirement, initiate "the Charter process to fire me," or negotiate a separation package.

{¶ 27} The next day, Tuesday October 8, 2019, Adkins issued an email apology to all Middletown employees. This email had a completely different tone from his statement to city council. Adkins admitted that in a moment of frustration, he went on a "three minute or so cussing rant at [Triple Moon]." He stated that he deeply regretted his actions, had reached out to the staff of Triple Moon to apologize, and was apologizing to all Middletown employees as well. Adkins acknowledged that city council must hold him accountable for his actions and he would take his discipline "freely and without reservation."

{¶ 28} At the city council meeting held on October 15, 2019, Adkins spoke and again apologized for his behavior at Triple Moon. Later, the council adjourned to executive session to discuss employment matters. After returning to general session, the council voted unanimously to suspend Adkins without pay for one day for his actions at Triple Moon.

{¶ 29} At a meeting of city council held less than a month later, on November 5, 2019, the council again adjourned to executive session to discuss an employee issue. Afterward, the council resumed general session and read emergency resolution R2019-43. In the resolution, council proposed to remove Adkins from his employment as city

manager under the terms of the Middletown City Charter.[2]  The five city council members unanimously voted to pass the resolution and terminate Adkins' employment as city manager.  At the time, Adkins was 56 years old.

### 5.New City Manager Hiring Process

{¶ 30} Upon Adkins' termination, city council appointed Susan Cohen, Middletown's Director of Administrative Services, as Acting City Manager.  Council entered into a contract with Cohen to pay her to perform duties as Acting City Manager in addition to her duties as Director of Administrative Services.  According to the parties, Cohen was a younger female, but we are unable to determine her age based on the record.  For purposes of our analysis below we will assume Cohen was significantly younger than Adkins.

{¶ 31} Middletown hired a company to search for a new city manager.  Ultimately, in May 2020, the city hired James M. Palenik to serve as the new city manager.  Palenik, a white male, was in his 60s at the time of his hire—that is, older than Adkins.

### 6. Adkins' Deposition Testimony Concerning Vitori

{¶ 32} Adkins testified at length about Vitori during his deposition.  He said he had first met Vitori before she was elected to city council.  At that time, Vitori invited Adkins to meet with her and other women who described themselves as civic leaders.  Vitori and the other women told Adkins that "older white men" in Middletown had caused many problems in the city.  They specifically referenced Larry Mulligan, Joe Mulligan, and the group of older white male civic and government leaders who met monthly at a local business, Martin Excavating, to discuss Middletown issues.  Vitori told Adkins that she and her group of women, on the other hand, were trying to make Middletown a better

---

2. Adkins' employment contract as city manager contained a provision allowing the city council to unilaterally terminate his employment through a majority vote under the City Charter.

place. She told Adkins that she would support him as city manager but hoped that he would not be one of the older white men who caused problems in the city. Adkins described this as a "friendly" meeting.

{¶ 33} Adkins also testified about conversations he had after his termination in which others told him about certain statements they heard Vitori make. These included:

- Betsy Hanavan, a Middletown historic district resident and self-proclaimed civic leader, told Adkins that she had heard Vitori say that (in Adkins' words) "white men needed to be replaced with women in positions of leadership to turn the city around."

- Ekey—Adkins' girlfriend—showed him text messages she had exchanged with Vitori in which Vitori described a "hit list" of older white men in positions of power in the city who Vitori believed needed to be replaced. The names on the hit list included Rick Pearce, the president of the Middletown Chamber of Commerce; Chuck Miller, the head of the Sorg Opera House; Les Landon, the former Middletown Law Director; and Duane Gordon, the executive director of the Middletown Community Foundation.[3]

- Duane Gordon contacted Adkins after his termination. Gordon, who had also been terminated from his job by that time, told Adkins that Traci Barnett, the woman who replaced Gordon after his own termination, told Gordon that Vitori had told her that Vitori had "orchestrated" Gordon's firing and that Vitori had access to the board members of the Middletown Community Foundation.

- Heather Gibson, Triple Moon's owner, told Adkins that she had a text message

---

3. The record reflects that, during discovery, Adkins provided Middletown with approximately 140 pages of text messages between Ekey and Vitori. These texts were provided to him by Ekey. Only 12 of those pages of texts are in our record, and are attached to Vitori's deposition.

from Vitori in which Vitori stated that she had "single handedly" arranged Adkins' termination. However, Adkins never saw this text message, it was not produced in discovery, and it is not part of the record.

**7. Affidavits Supplied by Adkins in Opposition to Summary Judgment**

{¶ 34} Adkins filed two affidavits in the summary judgment proceedings, one by Lauren Matus, a Middletown resident and the development officer with the Middletown Community Foundation, and one by Jennifer Ekey. Both Matus and Ekey averred that Vitori had a "hit list" of "older white males to replaced and/or worked around" and that Adkins was on this list.

**8. Ami Vitori's Deposition Testimony**

{¶ 35} Vitori testified that prior to being elected to city council, she worked with Adkins, and enjoyed doing so. After she was elected in 2018, she thought that he was doing a great job.

{¶ 36} However, in 2019, her second year on council, she noticed that Adkins was becoming less effective, which she opined may have had to do with issues in his personal life. She noted that Adkins had a relationship with a city employee. Then, when council member Larry Mulligan asked Adkins directly whether he was in a relationship with a subordinate, Adkins denied it. But, six months later, Adkins came to council and admitted the relationship with Ekey, gave a "big speech" and stated that he was in love.

{¶ 37} Vitori testified that as far as professional mistakes by Adkins, she noted an issue with the county land bank, where "things were not getting [accomplished] appropriately and timely" and the officials at Butler County were upset with Middletown for these failures. Vitori also noted that a city employee had "dropped the ball" and lost the city a lot of grant money. After this occurred, Adkins advised city council that he wanted to fire the employee, and that the employee was an alcoholic. Vitori stated that

Adkins had known about the employee's condition and failures for over a year and did nothing.

{¶ 38} Regarding the homelessness issue, Vitori stated that the city had a working group on homelessness and that Adkins had generated ideas to improve the situation, but that, months later, the situation had become much worse. According to Vitori, Adkins acted "like he didn't really know about [the homelessness issue] and there wasn't much to have been done."

{¶ 39} Vitori denied that she attempted to orchestrate Adkins' firing by generating a fake controversy over homelessness in the city. And she stated she did not confer with Chief Muterspaw over homelessness. Instead, she had citizens coming to her complaining about the homeless entering their businesses and doing things like stripping naked or brandishing knives. So she became "mad" when Adkins came to the meeting on October 1, 2019 and responded in the manner he did when she had previously tried to get Adkins to do something about the homelessness issue. And she felt like the citizens were mad at Adkins as well.

{¶ 40} Vitori stated she was also aware that the employees of the police department were not "happy" with Adkins. And on a personal level, Vitori felt that Adkins had become increasingly antagonistic towards her.

{¶ 41} Regarding the Triple Moon incident, Vitori stated that she got texts and phone calls within seconds of the incident, with people relaying to her that "[Adkins] is screaming at everyone at Triple Moon." Vitori stated that this was unacceptable behavior and so city council decided very quickly that he needed to be disciplined. The "original" discipline was a one-day suspension without pay.

{¶ 42} After this initial discipline, Vitori stated that council members began hearing from people at Butler County and other community organizations who were relaying

negative experiences working with Adkins. Vitori stated that after hearing about these issues, coupled with her own reservations about being able to trust what Adkins told the council, it became clear that he was no longer effective in the role of city manager.

{¶ 43} Regarding the alleged "hit list," she stated that the term was "tongue-in-cheeky." However, she stated that she did believe there was an "old guard" of individuals in the Middletown community that were ineffective in their roles or otherwise not promoting the best interest of Middletown. And she did believe that these people needed to be removed. She cited a few examples of members of this "old guard" whom she had personally interacted with and gave specific examples of their ineffectiveness in their leadership roles.

{¶ 44} Adkins' counsel confronted Vitori with text communications between herself and Jennifer Ekey in which she complained about white men. In February 2017 (before her election to council), she stated that "Middle aged white men suck the life out of me" and "They've gotten away with being mediocre for so long. And still 'succeeding.'" Referring to Rick Pearce (the Middletown Chamber of Commerce President), Vitori wrote "This summer getting him out will be on my top five things to do list." Vitori confirmed in the same text message that she referred to "male whiteness." In her deposition, she agreed that "male whiteness" was all that Pearce "brings to the table."

**9. Larry Mulligan**

{¶ 45} During his deposition, Larry Mulligan was asked what he may say about Adkins at trial that was negative.[4] He said that he had heard from the previous city manager that Adkins could be a bull in a china shop. He also said that Adkins could be forceful at times in conveying his opinions.

---

4. We will refer to Larry Mulligan as "Larry" and Joseph Mulligan as "Joseph" to avoid confusion.

{¶ 46} Larry was then asked to explain his decision process in deciding to vote to terminate Adkins' employment. He stated that it was clear that Adkins had lost the support of the police chief and the police department. He believed that Adkins "could not be an effective leader with, you know, a good third of the public safety staff not supporting" him. Larry said this was the "main factor" in his decision to vote to terminate Adkins. He said that the other main factor in his decision was his disapproval of the way Adkins handled the Triple Moon incident and his belief that Adkins' apology was insincere.

### 10. Joseph Mulligan

{¶ 47} Joseph Mulligan testified that he initially had a positive impression of Adkins; he saw Adkins as "dedicated."

{¶ 48} After being asked to describe the negative things he may say about Adkins at trial, Joseph proceeded to list numerous concerns. Those concerns included:

- In 2015 or 2016, Joseph heard from a Butler County official that Adkins had been at a meeting with county officials involving the county land bank. During this meeting, Adkins lost his temper and used unprofessional language. The Butler County Treasurer contacted Joseph and said she was concerned with Adkins' behavior.

- Adkins was not interested or receptive to the county commission, which had expressed willingness to provide economic assistance to the city of Middletown. There were federal funds available to assist the city to tear down properties and Adkins was not "receptive" to identifying these properties. So, Joseph, with some assistance from his fellow council members, forced the issue and got the city to act. Joseph stated that he could not understand why Adkins was not "playing nicely" with the county government, which had more resources than the city.

- Joseph was concerned when he became aware that Adkins was involved in a

romantic relationship with a subordinate, Ekey.

- Joseph was concerned with Adkins' efforts to mitigate the homelessness issue in Middletown. Adkins had proposed moving a shelter out of the downtown area, and assured council that things would be better. But instead, the homeless just moved into encampments.

- Joseph was concerned that Adkins had a falling out with the city police chief.

- Joseph was concerned about Adkins' "interaction" with Vitori, as there "seemed to be a lot of locking horns between those two." He was aware of some of their disagreements and said that some of the emails between them were "a little chippy." But he felt that Vitori was not unreasonable in her dealings with Adkins. In this regard, Joseph noted that Adkins was highly paid and part of his job was to deal with difficult council members. Vitori was an elected official, and if there were differences of opinion, Adkins needed to work those out with her.

- Joseph was concerned with Adkins' conduct in the Triple Moon incident. He noted that Adkins was a proponent of telling a "good Middletown story." But Joseph observed that when a city manager gets into verbal disagreements with business owners, "that's not a good story."

{¶ 49} Moreover, Joseph specifically testified that the Triple Moon incident was connected to Adkins' suspension and termination. He explained that he spoke to Mayor Mulligan about the incident and the "pros and cons" of terminating Adkins after the incident. The pros of firing Adkins were that they would be terminating a city manager who had lost the confidence of the city employees, the city council, and the community, who had questions about his effectiveness. The cons were a lack of continuity in ongoing city projects. Ultimately, Joseph decided that separating Adkins from the city was in the city's best interest.

{¶ 50} Joseph also described the single conversation he had with Vitori about the Triple Moon incident. They discussed "the difficulty that [Adkins] would have moving forward being an effective manager in light of the friction with, you know, police department, with business owners downtown, with the community, working with Ms. Vitori." He remembered that Vitori "was leaning towards separating" Adkins from his employment, but he did not testify that Vitori's statements influenced him in any way.

### 11. Talbott Moon

{¶ 51} Talbott Moon testified that for a number of years, he had a favorable impression of Adkins. However, in the months preceding the Triple Moon incident, he started having "a number of concerns."[5] These included:

- Moon was concerned that Adkins had "burned some bridges" with elected officials throughout Butler County, which was going to significantly impact the performance of his duties. He was aware that these county officials did not or would not work with Adkins. Moon explained that the Middletown city manager needed to maintain strong relationships with these officials and also with the "area partners."

- Moon was concerned about Adkins dating Ekey, "a member of the staff."

- Moon was also concerned about Adkins' relationship with Vitori and noted that they did not have a working relationship and that there was a lot of "frustration" between the two.

- Regarding the Triple Moon incident and Adkins' response to the homelessness issue, Moon stated that Adkins' behavior had frustrated the Middletown community. Moon stated that when the Triple Moon incident occurred, he was up for re-election and was knocking on doors. The number one concern he heard from voters was

---

5. Talbott Moon has no relation to the Triple Moon coffee shop.

the homelessness issue. He believed that the community had a perception that the city and the city staff were not taking these concerns seriously.

- Moon also had concerns that Adkins was not being "forthcoming" to city council about the homelessness issue. Moon recalled that when he questioned Adkins about conversations people had told Moon they had with Adkins, Adkins would state that the conversation did not happen or that the description of the conversation was not accurate. This made Moon question Adkins' truthfulness.

### 12. Steve Bohannon

{¶ 52} Steve Bohannon testified that he initially had a good relationship with Adkins, but that changed before Adkins' firing. When asked to explain anything negative he may say about Adkins' performance, Bohannon stated that his concerns with Adkins were his dating a subordinate (Ekey) and the "blowup" at Triple Moon. Bohannon explained that council went into executive session to discuss the Triple Moon incident, and subsequently council "dealt with it" and terminated Adkins' employment.

{¶ 53} Bohannon had also learned from Chief Muterspaw that the rank and file police officers took a vote and were not confident in Adkins.

### D. Summary Judgment Motions and Decision

{¶ 54} In October 2023, Middletown moved for summary judgment on all of Adkins' claims. The common pleas court subsequently granted summary judgment in favor of Middletown.

{¶ 55} Regarding Adkins' age and sex discrimination claims, the court noted that Adkins argued that Middletown had fired him and replaced him with a younger female. The court disagreed, finding that Adkins' regular duties had been temporarily re-assigned to a younger female (Susan Cohen), until a replacement was hired. This replacement was a white male who was older than Adkins.

{¶ 56} With regard to Adkins' race discrimination claim, the court found nothing in the record demonstrating that Middletown engaged in racial discrimination against Adkins based on his race (white). Again, the court noted that Middletown had hired a white male as Adkins' replacement. The court noted that Vitori's comments could indicate a personal animus towards white males, but Adkins had failed to offer anything other than conclusory statements to demonstrate that Middletown had discriminated against him because of his race.

{¶ 57} Finally, regarding Adkins' retaliation claim, the court rejected the applicability of a "cat's paw" theory wherein Vitori was biased against him and influenced the remainder of her non-biased council members to retaliate against Adkins for engaging in protected employment activities. The court noted that Vitori could not single-handedly cause Adkins' termination and that the other remaining members of council gave their own reasons for ousting Adkins, including his outburst at Triple Moon and other deficiencies in his performance.

{¶ 58} Adkins appealed, challenging the grant of summary judgment to Middletown in two assignments of error. We will address Adkins' arguments below. But first, we pause to note that in his complaint, Adkins' discrimination and retaliation claims relate to (1) the termination of his employment, and (2) the city "treating him less favorably than similarly-situated" younger, female, non-white employees. However, by the time of summary judgment briefing, Adkins limited his arguments to his termination, and did not make any arguments about being treated less favorably than "similarly situated" younger, female, and/or non-white employees. In fact he never referred, either in his summary judgment briefing before the trial court or in his briefing on appeal, to any alleged "similarly situated" individual. The trial court analyzed Adkins' claims as solely relating to his termination, and Adkins did not argue this was error on appeal. We therefore also limit

our analysis to Adkins' claims that his termination was an act of age, sex, and race discrimination and retaliation.

## II. Law and Analysis

## A. Summary Judgment Standard

{¶ 59} "Summary judgment is a procedural device used to terminate litigation when there are no issues in a case requiring a formal trial." *Franchas Holdings, L.L.C. v. Dameron*, 2016-Ohio-878, ¶ 16 (12th Dist.), citing *Roberts v. RMB Ents., Inc.*, 2011-Ohio-6223, ¶ 6 (12th Dist.). "Civ.R. 56 sets forth the summary judgment standard." *State ex rel. Becker v. Faris*, 2021-Ohio-1127, ¶ 14 (12th Dist.). "Pursuant to that rule, a court may grant summary judgment only when (1) there is no genuine issue of any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) the evidence submitted can only lead reasonable minds to a conclusion that is adverse to the nonmoving party." *Spitzer v. Frisch's Restaurants, Inc.*, 2021-Ohio-1913, ¶ 6 (12th Dist.), citing *BAC Home Loans Servicing, L.P. v. Kolenich*, 2011-Ohio-3345, ¶ 17 (12th Dist.). "A material fact is one which would affect the outcome of the suit under the applicable substantive law." *Hillstreet Fund III, L.P. v. Bloom*, 2010-Ohio-2961, ¶ 9 (12th Dist.), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

{¶ 60} The party moving for summary judgment bears the initial burden of demonstrating that no genuine issue of material fact exists. *Touhey v. Ed's Tree & Turf, L.L.C.*, 2011-Ohio-3432, ¶ 7 (12th Dist.), citing *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 1996-Ohio-107. The moving party "must be able to point to evidentiary materials of the type listed in Civ.R. 56(C) that a court is to consider in rendering summary judgment." *Kelley v. Dayton Pub. Schools Bd. of Edn.*, 2024-Ohio-979, ¶ 21 (2d Dist.), citing *Dresher* at 292-93. Once the moving party meets this burden, the nonmoving party has a reciprocal burden requiring it to present evidence to demonstrate that there is some issue

of material fact yet remaining to be resolved. *Smedley v. Discount Drug Mart, Inc.*, 2010-Ohio-5665, ¶ 11 (12th Dist.). The nonmoving party does this by presenting "'specific facts,'" demonstrating the existence of a genuine triable issue; the nonmoving party "'may not rest on the mere allegations or denials in its pleadings.'" *Oliphant v. AWP, Inc.*, 2020-Ohio-229, ¶ 31 (12th Dist.), quoting *Deutsche Bank Natl. Trust Co. v. Sexton*, 2010-Ohio-4802, ¶ 7 (12th Dist.), citing Civ.R. 56(E). "Summary judgment is proper if the nonmoving party fails to set forth such facts." *Taylor v. Atrium*, 2019-Ohio-447, ¶ 10 (12th Dist.), citing *Puhl v. U.S. Bank, N.A.*, 2015-Ohio-2083, ¶ 13 (12th Dist.). "In determining whether a genuine issue of material fact exists, the evidence must be construed in favor of the nonmoving party." *Assured Admin., L.L.C. v. Young*, 2019-Ohio-3953, ¶ 14 (12th Dist.), citing *Vanderbilt v. Pier 27, L.L.C.*, 2013-Ohio-5205, ¶ 8 (12th Dist.).

{¶ 61} An appellate court reviews a trial court's decision on a motion for summary judgment de novo, independently, and without deference to the decision of the trial court. *Wulf v. Bravo Brio Restaurant Group, Inc.*, 2019-Ohio-3434, ¶ 15 (12th Dist.).

### B. Discrimination Claims

{¶ 62} Adkins' first assignment of error states:

> THE TRIAL COURT ERRED BY GRANTING SUMMARY JUDGMENT IN FAVOR OF APPELLEE ON APPELLANT'S DISCRIMINATION CLAIMS.

{¶ 63} The trial court found, and the parties agree, that Adkins satisfied the first three prongs of a prima facie case of discrimination under the *McDonnell Douglas* framework (explained further below) with respect to his age, sex, and race discrimination claims. However, the trial court found that Adkins failed to satisfy the fourth prong of the prima facie case with respect to all three claims, and on that basis granted summary judgment to Middletown with respect to those claims.

{¶ 64} Adkins argues that the trial court erred in granting Middletown summary

judgment with respect to his age, sex, and race discrimination claims because it incorrectly determined that he failed to establish a prima facie case with respect to all of those claims. With respect to Adkins' age and sex discrimination claims, Adkins argues the trial court erred in holding that he did not present Civ.R. 56(C) evidence establishing the fourth prong of the prima facie case applied by the court. Adkins also argues that even if he did not establish that version of the fourth prong, the trial court should have applied a different version of that prong, and that he presented Civ.R. 56(C) evidence establishing that version of the fourth prong. With respect to his race discrimination claim, Adkins argues the trial court erred in holding that he did not present Civ.R. 56(C) establishing a prima facie case under the different version of the *McDonnell Douglas* framework applicable to a "reverse discrimination" claim. Because Adkins makes different arguments with respect to his age and sex claims as compared to his race claim, we will analyze these claims separately.

**1. Age and Sex Discrimination Claims - Applicable Law and Analysis**

{¶ 65} R.C. 4112.02(A) provides that it is an unlawful discriminatory practice:

> For any employer, because of the race, color, religion, sex,
> military status, national origin, disability, age, or ancestry of
> any person, to discharge without just cause, to refuse to hire,
> or otherwise to discriminate against that person with respect
> to hire, tenure, terms, conditions, or privileges of employment,
> or any matter directly or indirectly related to employment.

The Ohio Supreme Court has held that federal court opinions interpreting Title VII of the Civil Rights Act of 1964 are "generally applicable" to cases involving alleged violations of R.C. Chapter 4112. *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civil Rights Comm.*, 66 Ohio St.2d 192, 196 (1981). For that reason, and to provide background regarding certain legal issues that we will discuss later, we will now

summarize relevant federal case law.[6]

### a. Overview of Relevant Federal Case Law

{¶ 66} Title VII of the federal Civil Rights Act of 1964 contains language similar to R.C. 4112.02(A). Title VII provides that it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. 2000e-2(a)(1). Age discrimination is prohibited by a different federal statute, the Age Discrimination in Employment Act of 1967. 29 U.S.C. 621 *et seq.* It states that it is an unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age" if that individual is at least 40 years of age. 29 U.S.C. 623(a), 631(a).

{¶ 67} In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the United States Supreme Court set forth a burden-shifting framework applicable to race discrimination claims brought under Title VII of the Civil Rights Act of 1964 when the plaintiff cannot point to direct evidence of discrimination. *Id.* at 802. As originally stated

---

6. We emphasize that we are citing federal law for background and persuasive value, and not as controlling authority with respect to R.C. 4112.02. As stated above, in *Plumbers*, the Ohio Supreme Court held that federal interpretation of Title VII is "generally applicable." For example, in *Plumbers*, the Ohio Supreme Court cited federal case law in interpreting an undefined phrase in R.C. 4112.05 that also appeared in Title VII. *Id*. at 196. We understand the holding of *Plumbers* to indicate that federal case law may *assist* in interpreting R.C. Chapter 4112. However, we do not read *Plumbers* as indicating that the federal courts are *controlling* authority in the interpretation of R.C. Chapter 4112 claims. *Accord McCray v. Springboro*, 1998 Ohio App. LEXIS 3208, *16 (12th Dist.) ("In construing Ohio's employment discrimination statutes, and in particular, the accrual of discrimination claims under R.C. 4112.02[N], Ohio courts may look to federal case law as persuasive authority."), quoting *Berarducci v. Oscar Mayer Foods Corp.*, 1984 Ohio App. LEXIS 10632, *6 (6th Dist., 1984). To view federal cases interpreting the federal Title VII statute as controlling with regard to the interpretation of R.C. 4112.02 would ignore the differences in the text of the federal and state statutes and would abdicate the state judiciary's constitutional role to interpret state law. Ohio Const., art. IV, § 1 ("The judicial power of the state is vested in a supreme court, courts of appeals, courts of common pleas and divisions thereof, and such other courts inferior to the supreme court as may from time to time be established by law.").

in *McDonnell Douglas*,

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.
>
> . . .
>
> The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection.
>
> . . .
>
> [The complainant must then] be afforded a fair opportunity to show that [complainant's] stated reason for respondent's rejection was in fact pretext.

*Id.* at 802-804. As written in *McDonnell Douglas*, the burden-shifting framework specifically applied to race discrimination claims arising out of an employer's failure to hire the plaintiff. *Id.* at 801. But over time, federal courts applied the *McDonnell Douglas* burden-shifting framework in other contexts. For example, federal courts have applied the *McDonnell Douglas* burden-shifting framework not only to failure-to-hire race discrimination claims, but to claims of discrimination based on sex, color, religion, and other protected categories under Title VII, regardless of whether such claims are based on the failure to hire, the termination of employment, harassment or hostile work environment, or pay discrimination.[7] And federal courts have applied the *McDonnell*

---

7. *Ade v. Conklin Cars Salina, L.L.C.*, 800 Fed.Appx. 646, 650-651 (10th Cir. 2020) (termination of employment claim on basis of sex); *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190-191 (4th Cir. 2010) (termination of employment claim on basis of race); *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (hostile work environment claim on basis of sex); *Elnashar v. Speedway SuperAmerica, L.L.C.*, 484 F.3d 1046, 1058-1059 (8th Cir. 2007) (hostile work environment claim on basis of race); Lenzi v. Systemax, Inc., 944 F.3d 97, 108-109 (2d Cir. 2019) (pay discrimination claim on basis of sex); *Taylor v.*

*Douglas* burden-shifting framework to claims of age discrimination under the Age Discrimination in Employment Act of 1967. *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311, fn. 2 (1996) (citing cases).

{¶ 68} Federal courts have also adapted the language of the *McDonnell Douglas* burden-shifting framework to account for the facts of specific cases. Such modifications have often affected the fourth prong of the prima facie case, as discussed below.

{¶ 69} We are aware of three main variations in how federal courts state the fourth prong of the *McDonnell Douglas* prima facie case. First, some cases describe the fourth prong as requiring a plaintiff to point to evidence establishing that the plaintiff "was replaced by a person outside of the protected class." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003), quoting *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 349 (6th Cir.1997). Second, some cases describe the fourth prong as requiring a plaintiff to point to evidence establishing that "a similarly-situated employee who is not a member of the protected class" was treated differently from the plaintiff. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 351 (6th Cir.1998). *Accord Clayton v. Meijer*, 281 F.3d 605, 610 (6th Cir.2002). Third, some cases describe the fourth prong as requiring a plaintiff to point to evidence establishing that "there are 'circumstances that support an inference of discrimination.'" *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 808 (6th Cir. 2020), quoting *Blizzard v. Marion Technical College*, 698 F.3d 275, 283 (6th Cir. 2012).[8] Which language is used depends on the context of a particular case. *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 529 (6th Cir. 2007) (listing alternative language used in cases with respect to fourth prong of prima facie case and explaining that "these are merely various context-

---

*United Parcel Service, Inc.*, 554 F.3d 510, 522-523 (5th Cir. 2008) (pay discrimination claim on basis of race).

8. The first two options we have just described can be seen as specific ways in which the third option can be satisfied.

dependent ways by which plaintiffs may establish a prima facie case").   "The key question," according to the Sixth Circuit, "is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence to permit a reasonable jury to conclude that he or she suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination."   *Id.*, citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

### b. Analysis of Adkins' Ohio Age and Sex Discrimination Claims

{¶ 70} We now return to Ohio law and the analysis of Adkins' claims.

{¶ 71} Ohio courts apply the *McDonnell Douglas* burden-shifting framework to claims of race, sex, and age discrimination brought pursuant to R.C. 4112.02 in which the plaintiff cannot point to direct evidence of discrimination, and must instead rely on indirect evidence.[9] *Mustard v. Timothy J. O'Reilly Co., Ltd.*, 2004-Ohio-425, ¶ 22 (12th Dist.) (sex discrimination); *Stair v. Phoenix Presentations, Inc.*, 116 Ohio App.3d 500, 508 (12th Dist.1996) (age discrimination); *Waddell v. Grant/Riverside Med. Care Found.*, 2017-Ohio-1349, ¶ 26 (race discrimination).   Like federal courts, Ohio courts apply different versions of the fourth prong of the prima facie case depending on the context of a particular case.

{¶ 72} In *Hoffman v. CHSHO, Inc.*, 2005-Ohio-3909 (12th Dist.), we applied the *McDonnell Douglas* burden-shifting framework to an Ohio *age* discrimination claim arising out of the alleged unlawful termination of employment.   *Id.* at ¶ 21.   We explained that a plaintiff relying on indirect evidence must first establish a prima facie case of discrimination.   *Id.*   Specifically, the plaintiff must point to evidence demonstrating that he

___

9. Adkins does not argue on appeal that he possessed direct evidence that he was terminated for discriminatory reasons, but rather that he produced prima facie evidence of a discriminatory employment practice with circumstantial evidence.

or she "(1) was a member of a statutorily-protected class; (2) was discharged; (3) was qualified for the position; and (4) *was replaced by, or his or her discharge permitted the retention of, a person not belonging to the protected class*." (Emphasis added.) *Id*. *Accord Coryell v. Bank One Trust Co. N.A.*, 2004-Ohio-723, ¶ 9 (same), citing *Kohmescher v. Kroger Co.*, 61 Ohio St.3d at syllabus (1991). We have held that this version of the fourth prong of the prima facie case is met if the plaintiff was replaced by a "person of substantially younger age." *Collins v. Mason*, 2020-Ohio-1186, ¶ 24 (12th Dist.)

{¶ 73} If the plaintiff successfully establishes a prima facie case of age or sex discrimination, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action." *Collins* at ¶ 25. If the employer meets this burden, "the plaintiff must then prove by a preponderance of the evidence that the reason articulated by the employer is merely a pretext for discrimination." *Id.* However, the "'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains with the plaintiff.'" *Id.*, quoting *Craddock v. Flood Co.*, 2008-Ohio-112, ¶ 13 (9th Dist.).

{¶ 74} Ohio courts have typically applied the same prima facie case language described above in cases alleging unlawful discrimination in the termination of employment based on *sex*. *Mendlovic v. Life Line Screening of Am., Ltd.*, 2007-Ohio-4674, ¶ 31 (8th Dist.); *Kelley*, 2024-Ohio-979 at ¶ 27 (2d Dist.); *Shaw v. Access Ohio*, 2018-Ohio-2969, ¶ 19 (2d Dist.). However, in those cases, rather than showing that the plaintiff was replaced by someone "substantially younger," the plaintiff is required to show that he or she was replaced by a member of the opposite sex. *Id*.

{¶ 75} With regard to both age and sex discrimination claims, "[a] person is replaced only when another employee is hired or reassigned to perform that person's

duties." *Collins*, 2020-Ohio-1186 at ¶ 24, citing *Craddock*, 2008-Ohio-112 at ¶ 12. "A person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *Id*.

{¶ 76} We conclude that the version of the fourth prong applied in *Hoffman*, *Collins*, *Mendlovic*, and the other cases discussed above—which asks whether the plaintiff was "replaced by, or his or her discharge permitted the retention of, a person not belonging to the protected class," *Hoffman*, 2005-Ohio-3909 at ¶ 21—is appropriate for the circumstances of this case. This version is appropriate here because this case concerns the termination of Adkins' employment, and Adkins *only* alleges that Middletown discriminated against him with respect to the termination of his employment.

{¶ 77} Adkins argues that he provided evidence satisfying this version of the fourth prong of the prima facie case analysis with respect to sex and age discrimination because he was replaced by Susan Cohen, who is both younger than Adkins and a woman. We disagree. The summary judgment evidence establishes that Cohen was simply "another employee . . . assigned to perform the plaintiff's duties in addition to other duties." *Collins* at ¶ 24. At the time of her appointment as "Acting City Manager," Cohen was serving as Middletown Director of Administrative Services. Middletown City Council Resolution R2019-43—the same resolution that terminated Adkins' employment—summarized Cohen's appointment. That resolution proposed appointing Susan Cohen as "Acting City Manager" in accordance with the "Contract for Acting City Manager Services" (which contract was attached to the resolution). The resolution stated that Cohen would serve as Acting City Manager "until Final Resolution of removal proceedings and the appointment of a new City Manager."

{¶ 78} Middletown's employment contract with Cohen confirms that the city was

- 28 -

employing Cohen to perform all city manager duties "*in addition* to her duties as the Director of Administrative Services of the City of Middletown" and that she would be compensated a weekly payment "*in addition* to her current salary as Director of Administrative Services."  (Emphasis added.)

{¶ 79} Cohen's affidavit, filed in the summary judgment record, establishes that in February 2020 (three months after Adkins' termination), Middletown contracted with "Management Partners, Inc." to search for a new city manager.  Her affidavit further provides that in May 2020, Middletown hired James Palenick to serve as Middletown's City Manager.  During the interview process, Palenick represented himself to be a white male who was approximately 60 years old.

{¶ 80} As stated above, a plaintiff arguing employment discrimination is not replaced by another employee when that employee is assigned to perform the plaintiff's duties in addition to other duties.  *Collins*, 2020-Ohio-1186 at ¶ 24.  Here the evidence is uncontroverted that Cohen was appointed Acting City Manager in addition to her other duties as Director of Administrative Services and that this was a temporary assignment until a new city manager could be located.  The city ultimately hired a white male who was older than Adkins to replace him.  As such, Cohen was not Adkins' replacement; Palenik was the replacement.

{¶ 81} Adkins attacks this conclusion from another angle; he suggests that Cohen should be considered his actual replacement because the city only hired Palenik for the purpose of defeating his age and sex discrimination claims.  He argues that the city hired Palenik after he filed a charge with the EEOC.  Notably, Adkins does not state when he filed the EEOC charge or point to the portion of the summary judgment record that supports this claim, and we have not found this document in the record.  Regardless, Adkins argues that the question of whether Cohen was his actual replacement and not a

temporary replacement is a fact question that should have precluded summary judgment.

{¶ 82} Again, we disagree. Adkins' suggestion that Cohen was secretly intended by city council to be a full-time replacement is entirely speculative and unsupported by any evidence in the record. Speculation does not generate a question of material fact necessary to defeat summary judgment. *See Baldwin v. Church of God of Trenton*, 2024-Ohio-1726, ¶ 33 (12th Dist.); *Davis v. Royal Paper Stock Co.*, 2022-Ohio-4135, ¶ 72 (12th Dist.); *CitiMortgage, Inc. v. Davis*, 2014-Ohio-3292, ¶ 24 (12th Dist.), citing *U.S. Bank Natl. Assn. v. Urbanksi*, 2014-Ohio-2362, ¶ 21 (10th Dist.)

{¶ 83} Adkins cites *McKinnon v. L-3 Communications Corp.,* 2018 WL 3863406 (S.D. Ohio Aug. 14, 2018). In *McKinnon*, the district court held that whether the person appointed to fill a position may be considered a "temporary" replacement remained a question of fact where there was evidence that the employer assessed whether the decision to hire a replacement would "fly" in light of the status of actual or anticipated litigation. *Id*. at *6. This case is unlike *McKinnon* in that Adkins has cited no evidence suggesting that Middletown considered Cohen as Adkins' permanent replacement and only hired Palenick, a white male, in anticipation of litigation.

{¶ 84} For these reasons, the summary judgment evidence demonstrates that Middletown contracted with Cohen as a temporary matter until the position was filled by the new city manager. Adkins cites no evidence controverting Middletown's summary judgment evidence on this point. Adkins was replaced by a person who was *not* substantially younger than him and was of the same sex. Adkins has not set forth circumstantial evidence establishing that he was replaced by, or that his termination permitted the retention of, a person of substantially younger age, or of a different sex, and thus he has not presented a prima facie case of age or sex discrimination through circumstantial evidence. *Collins*, 2020-Ohio-1186 at ¶ 24. We therefore conclude that

the trial court properly granted summary judgment in favor of Middletown on Adkins' age and sex discrimination claims because Adkins failed to establish the fourth prong of a prima facie case.

### c. Alternative Fourth Prong Analysis

{¶ 85} Above we described three versions of the fourth prong of the *McDonnell Douglas* prima facie case analysis applied by federal courts. Pointing to these variations, Adkins argues the trial court applied the wrong version of the fourth prong of the prima facie case analysis. Specifically, Adkins argues that—given the evidence in and context of this case—the appropriate fourth prong was not whether the evidence demonstrated that he was replaced by a person who was substantially younger than him and female, (premised on the test set forth in *Hoffman*, 2005-Ohio-3909 at ¶ 21), but rather whether he presented evidence demonstrating that his termination occurred under "circumstances that support an inference of discrimination." *Willard*, 952 F.3d at 808.

{¶ 86} Adkins argues that he established this version of the fourth prong by pointing to the various statements by Vitori in which she complained about ineffective older males in leadership positions within the city of Middletown, her "hit list," and similar comments by Vitori. In other words, Adkins believes that Vitori's comments are circumstantial evidence of age and sex discrimination against him, and thus he does not need to prove that Middletown replaced him with a person not belonging to the protected class.

{¶ 87} In support, Adkins cites *Liebau v. Dykema Gossett, PLLC*, 2024 U.S. App. LEXIS 10030, *11-15 (6th Cir. Apr. 23, 2024).[10] In *Liebau*, the Sixth Circuit found that

---

10. Adkins also cites *Willard* and *Blizzard*, 698 F.3d 275 (previously cited in this opinion). In *Blizzard*, the Sixth Circuit explained that "circumstances that support an inference of discrimination" may be established if a plaintiff was replaced by another individual, but only if the difference in age is "significant." *Id.* at 283, citing *Grosjean*, 349 F.3d at 336. In *Willard*, the Sixth Circuit explained that circumstances supporting an

"allegedly ageist comments" and "actions" may be sufficient to raise a "plausible inference of discrimination" but only if the person was a decisionmaker with respect to the adverse actions against the plaintiff. *Id.* at *12. *Liebau* provides some persuasive support to Adkins' position that ageist and sexist comments and actions by a decisionmaker, alone, may establish the fourth prong of the *McDonnell Douglas* framework.

{¶ 88} But even if Adkins were correct that the trial court should have applied the "circumstances that support an inference of discrimination" version of the fourth prong in this case, the trial court's summary judgment decision would still not be in error. This is the case because even if Vitori's biased comments all applied to Adkins personally (which they did not) and were all proximate in time to Adkins' termination (which they were not), and even if the comments were sufficient to establish the fourth prong of the prima facie case if Vitori had been the sole decisionmaker with regard to Adkins' termination, she was in fact *not* the sole decisionmaker. Instead, Vitori was only one of five council members who unanimously voted to terminate Adkins' employment. In a case where the individual who is alleged to have made discriminatory comments or acted with discriminatory animus is not the sole decisionmaker, a plaintiff may prove his or her discrimination claim based on the "cat's paw" theory of liability. We have explained,

> The cat's paw theory of liability in the employment discrimination context refers to a situation in which a biased subordinate, who lacks decisionmaking power, influences the unbiased decisionmaker to make an adverse employment action, thereby hiding the subordinate's discriminatory or retaliatory intent.

*Collins*, 2020-Ohio-1186 at ¶ 50, citing *Bahar v. Youngstown*, 2011-Ohio-1000, ¶ 71 (11th

---

inference of discrimination "include when the employer replaced the plaintiff with a younger employee and when the employer 'treated similarly situated, non-protected employees more favorably.'" 952 F.3d at 808. Given that *Blizzard* and *Willard* directly tie "circumstances that support an inference of discrimination" to the replacement by a person not in the protected class, they seem to blur the distinction between the "replacement" version of the fourth prong applied by the trial court and the "circumstances" version urged by Adkins, rather than fully supporting Adkins' argument.

Dist.). *Accord DeNoma v. Hamilton Cty. Court of Common Pleas*, 626 Fed.Appx. 101, 105-106 (6th Cir. 2015), citing *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011). Stated more simply, the cat's paw theory refers to "a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *E.E.O.C. v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 484 (10th Cir.). The "dupe" is the "cat's paw."[11]

**{¶ 89}** The cat's paw theory may be applied where the adverse employment action results from a group decision. *Bledsoe v. Tennessee Valley Authority Bd. Of Directors*, 42 F.4th 568 (6th Cir. 2022). In *Bledsoe*, the Sixth Circuit stated:

> That the Committee voted unanimously for demotion does not foreclose Bledsoe's claim. *Gutzwiller*, 860 F.2d at 1327. The Supreme Court indicated as much in *Reeves v. Sanderson Plumbing Products*. 530 U.S. at 152-53, 120 S.Ct. 2097. In that case, multiple company managers, including one who discriminated against the plaintiff, recommended to the president of a company that the plaintiff be fired. *Id.* at 138, 120 S.Ct. 2097. The Court admonished the appellate court, which granted summary judgment to the employer, for "giving weight" to the other managers' lack of animus and "discredit[ing]" the plaintiff's evidence that the biased manager made the decision. *Id.* at 152-53, 120 S.Ct. 2097. Group decisions—especially small group decisions—often involve deference to an experienced or passionate member, and one person's influence often leads to a unanimous result. Construing the evidence in Bledsoe's favor, a jury could determine that is what happened here.

*Id.* at 584.

**{¶ 90}** The *Bledsoe* court observed that application of the cat's paw theory of liability requires a showing that the ultimate decisionmaker(s) relied upon the biased employee's knowledge or expertise in taking adverse employment action. *Id*. In other words, "[t]he plaintiff must show that the lower-level supervisor's discriminatory animus

---

11. The literary basis for the term "cat's paw" is explained in *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d at 484, citing *Fables of La Fontaine*, 344 (1984).

was a 'but-for' cause of, or a determinative influence on, the unbiased superior's adverse employment decision." *Smith v. Dept. of Pub. Safety*, 2013-Ohio-4210, ¶ 62 (10th Dist.). Other Ohio courts have also noted that the cat's paw theory requires a but-for showing. *Townsend v. Kettering*, 2022 Ohio Misc. LEXIS 4175, *9 (C.P.) (discussing "increased burden of proof on the plaintiff" associated with cat's paw theory's "but-for" requirement), citing *Smith* at ¶ 62. We have noted that due to the "but-for" requirement, a plaintiff attempting to prove liability under a cat's paw theory must "demonstrate a direct causal connection between the subordinate's discriminatory animus and the decisionmaker[']s adverse employment action." *Collins*, 2020-Ohio-1186 at ¶ 50.

{¶ 91} Do the references to a "subordinate" in the cases we have just cited mean that the cat's paw theory may not be applied here, where Vitori was not a "subordinate," but one of five city council members with an equal vote? No. The cat's paw theory has been applied in cases in which a city council took action against an employee where the employee alleged one of the city council members (or another city employee), acting with discriminatory animus, used the city council as an unknowing cat's paw. *Jones v. Hutto*, 2024 U.S. Dist. LEXIS 27732, *48 (W.D. Tex. Jan. 11, 2024) (two city council members with discriminatory animus towards plaintiff used city council as cat's paw in influencing council's decision to terminate plaintiff's employment); *Hannon v. Prospect Heights*, 2023 U.S. Dist. LEXIS 112302, *47-53 (N.D. Ill. June 29, 2023) (plaintiff's discrimination claim survives summary judgment when evidence suggest city alderman and city administrator with discriminatory animus towards plaintiff influenced city council to change plaintiff's position to full-time, knowing this would cause plaintiff to quit); *Lamonte v. Hampton*, 576 F. Supp. 3d 1314, 1327-28 (N.D. Ga. 2021) (plaintiff established prima facie case where evidence would allow a jury to conclude that mayor with discriminatory animus influenced information provided to city council, inserted negative information, failed to provide

exonerating information, and acted to cause reputational harm to plaintiff in order to cause city council to terminate plaintiff's employment).

{¶ 92} Two cases are instructive here. The first, *Collins*, 2020-Ohio-1186, was already mentioned above. There, we held that Collins "failed to establish a prima facie case of retaliation pursuant to the cat's paw theory of liability." *Id.* at ¶ 51. We explained in relevant part that:

> the memorandum relied upon by [the city manager] in terminating Collins was a joint memorandum from both [the director of city services] and [the human resources director]. Collins does not point to any summary judgment evidence that [the human resources director] had any discriminatory animus toward him or that she was influenced by [the allegedly biased director of city services] in recommending Collins' termination. Finally, Collins does not contest the truth of the findings concerning his outside employment, his failure to advise the City about his work for [another employer], and his refusal to answer inquiries regarding his relationship with [the other employer] during the City's investigations. This is not a case "where a biased, mid-level supervisor presented the ultimate decision maker with false information in order to secure the plaintiff's termination." *Nebozuk*, 2014-Ohio-1600 at ¶ 48. Rather, [the director of city services] and [the human resources director] reported the fact of Collins' conduct to [the city manager], and [the city manager] independently determined that Collins' conduct necessitated termination. *Id.*
>
> Having failed to present Civ.R. 56(C) evidence establishing a causal connection between his alleged protected activity and his termination, Collins cannot prevail under the cat's paw theory of liability. The trial court, therefore, did not err in granting summary judgment to the City regarding Collins' retaliation claim.

*Id.* at ¶ 52-53. Though in *Collins* we analyzed the cat's paw theory in the retaliation context, that analysis applies equally in the discrimination context because the elements of a cat's paw theory do not depend on whether the claim at issue is a discrimination or retaliation claim. *Id.* at ¶ 50 (explaining requirements for proving cat's paw theory of liability).

{¶ 93} The second is *Batz v. Sebring*, 2019 U.S. Dist. LEXIS 48145 (S.D. Fla. March 21, 2019). Batz was the City of Sebring's fire chief. *Id.* at *2. The city's mayor recommended to city council that Batz's employment be terminated. *Id.* at *22. Batz argued that the mayor recommended his termination not for the mayor's stated reasons, but in retaliation for Batz's protected whistleblower conduct. *Id.* at *53. In analyzing Batz's cat's paw argument, the federal district court stated:

> The Court finds that the discharge decision in the instant case cannot be properly characterized as merely a rubber stamp of the Mayor Shoops' [sic] recommendation. The Mayor and the voting Council members essentially agreed on the reasons why Batz should be terminated, and each Council member articulated their own experience interacting with Batz supporting their reasoning for voting to discharge him. Batz has not demonstrated a factual dispute as to the motivations of any of the reasons held by the voting Council members. Each of the Council members had their own interactions with Batz as the City's Fire Chief, and each formed their own opinions, as reflected in their undisputed affidavits. Under these facts, Batz's cat's paw argument is rejected.

*Id.* at *55-56. For this and other reasons, the court granted the city's motion for summary judgment. *Id.* at *57.

{¶ 94} Adkins argues that an inference that Vitori influenced the other Middletown city council members to vote for Adkins' termination arises from a few undisputed facts. First, Adkins points to the fact that city council initially imposed only a one-day suspension on Adkins for the Triple Moon incident, and only later terminated his employment. Second, Adkins points to the fact that Adkins complained about what he calls "Vitori's discriminatory views and retaliatory actions" during city council's October 7, 2019 meeting. Third, Adkins points to the fact that Larry Mulligan wrote a positive letter of recommendation for Adkins after his termination. Adkins argues that "construing the[se] facts in favor of Adkins, the record supports a reasonable inference that the reasons the council members gave for a supposed loss of confidence in Adkins were nothing more

than a 'convenient excuse' to fire him in accordance with Vitori's longstanding desire to do so because he is an older white male and was on her 'hit list' for removal from office."

{¶ 95} We disagree. Adkins essentially asks this court (and a jury) to speculate about the meaning of these facts—to speculate that because council increased Adkins' initial punishment, that because Vitori had discriminatory views about older white men and Adkins complained, and that because Larry Mulligan wrote a positive recommendation letter for Adkins, Vitori must have influenced the council members. But even construing these facts in the light most favorable to Adkins, none speak in any way to council members being influenced by Vitori with respect to their decisions to vote to terminate Adkins' employment. Adkins merely invites speculation about conversations and interactions not in the record evidence. As stated earlier, speculation does not generate a question of material fact that defeats summary judgment. *Baldwin*, 2024-Ohio-1726 at ¶ 33; *Davis*, 2022-Ohio-4135 at ¶ 72; *CitiMortgage*, 2014-Ohio-3292 at ¶ 24.

{¶ 96} Meanwhile, the testimony of Larry Mulligan, Joseph Mulligan, Moon, and Bohannon as to the reasons why they were dissatisfied with Adkins' performance— testimony that does not reveal any influence by Vitori on their decisions—is undisputed. While some council members had more or fewer concerns about Adkins than others, they all viewed Adkins' conduct in the Triple Moon incident as unacceptable. None testified that their decision to vote to terminate Adkins was influenced by Vitori, or provided any testimony from which such an inference could be made. These council members' motivations for their votes to terminate Adkins being undisputed, Adkins' cat's paw theory receives no support whatsoever from their testimony. *Batz*, 2019 U.S. Dist. LEXIS 48145 at *55-56.

{¶ 97} Adkins did offer one, single piece of evidence potentially relevant to a cat's

paw analysis. Specifically, Adkins testified that Triple Moon's owner, Heather Gibson, told him that she had a text message from Vitori in which Vitori stated that she had "single handedly" arranged Adkins' termination. Adkins admitted that he never saw this text message and that he was uncertain of the details of what Vitori told Gibson. He testified that Gibson "was talking about something with the city and [Vitori] said—all I know—**I don't know the content of the conversation** other than [Vitori] had told [Gibson] that [Vitori] had single handedly got Doug Adkins fired." (Emphasis added.) The text message was not produced in discovery.

{¶ 98} Adkins' testimony about Gibson's statement about Vitori's text presents a possible "double hearsay" or "hearsay within hearsay" issue. If Adkins' testimony about Gibson's statement about Vitori's unproduced text message were admissible, it would potentially create a question of fact supporting Adkins' cat's paw theory. Adkins, however, makes no argument on appeal articulating how the statement would be admissible. We have repeatedly held that hearsay statements, which are not admissible at trial, may not be considered in the summary judgment context unless a hearsay exception applies. *Meranda Nixon Estate Wine, L.L.C. v. Cherry Fork Farm Supply Co.*, 2024-Ohio-1523, ¶ 50, 52 (12th Dist.); *Turnmire v. Turnmire*, 2022-Ohio-3968, ¶ 25 (12th Dist.). We must therefore determine if the testimony is admissible.

{¶ 99} Evid.R. 805 provides that, "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules."

{¶ 100} Vitori's alleged text message stating that she single-handedly arranged Adkins' termination could potentially be a party-opponent admission under Evid.R. 801(D)(2). We will assume, without deciding, that Vitori's statement is therefore not

hearsay and would be admissible, *if offered on its own*.[12]  However, Gibson's statement to Adkins about Vitori's text message is an out-of-court statement that would be offered by Adkins to prove the truth of the matter asserted, and it is therefore hearsay.  Upon our review, we can locate no hearsay exception that would make Gibson's statement admissible, and Adkins has not pointed to any such exception.  Because Gibson's statement about Vitori's putative text message is not admissible, we also may not consider Vitori's text message about single-handedly arranging for Adkins' termination, even though Vitori's statement may have been admissible on its own.  *Residential Funding Co., L.L.C. v. Thorne*, 2012-Ohio-2552, ¶ 31-34 (6th Dist.) (holding statement in press release on its own would be admissible as party-opponent admission, but nevertheless excluding that statement because the press release itself was inadmissible hearsay); *State v. Liles*, 1992 Ohio App. LEXIS 3404, *7-9 (6th Dist. June 30, 1992) (only admitting all pieces of double-hearsay statement because all of the statements, "at each stage, clearly fall within the above exceptions to the hearsay rule"); *EnTech, Ltd. v. Speece*, 841 Fed. Appx. 944, 951-52 (6th Cir. 2021) (stating party-opponent admission only admissible if testimony about that party-opponent admission was not hearsay); *Kentucky ex rel. Chandler v. Louis Trauth Dairy*, 1998 U.S. App. LEXIS 7743, *19-21 (6th Cir. 1998) (excluding out-of-court party-opponent admission that was not hearsay because it was contained within hearsay to which no hearsay exception applied).[13]

---

12. Vitori is not a party.  However, an individual's admission is considered a party's admission (and thus not hearsay) if "(1) the party has manifested his adoption or belief in its truth, (2) the party authorized the declarant to make the statement, or (3) the statement was made by an agent or servant in the course of the employment or agency relation." *Ball v. Cons. Rail Corp.*, 142 Ohio App.3d 748, 755-56 (8th Dist. 2001).  Adkins has presented no argument on appeal that Vitori was an agent of Middletown because she, as a city council member, had authority to take action regarding Adkins' employment.  Nor has Adkins argued or pointed to any evidence that Vitori's statement was made "in the course of the employment or agency relation."

13. We cite federal cases on this evidentiary issue because Evid.R. 805 and Fed. R. Civ. P. 805 are nearly identical, and when Ohio evidence rules are similar to federal evidence rules we may look to federal case

{¶ 101} Therefore, Adkins points to no admissible evidence supporting his argument that Vitori used city council as a cat's paw. As in *Collins* and *Batz*, Adkins has not pointed to any admissible summary judgment evidence supporting a cat's paw theory or an inference of discrimination with respect to even a bare majority of city council in conjunction with his termination. More specifically, he has not pointed to any admissible summary judgment evidence suggesting that the other four members of Middletown's city council were influenced by Vitori in their decisions to vote to terminate his employment.[14]

{¶ 102} Because the cat's paw theory is not established, Adkins cannot establish the fourth prong of a prima facie case of either age or sex discrimination, even under the "circumstances that support an inference of discrimination" version of the fourth prong preferred by Adkins. We therefore hold that the trial court did not err in granting summary judgment to Middletown on Adkins' age and sex discrimination claims.[15]

## 2. Race Discrimination

{¶ 103} We now turn to Adkins' race discrimination claim.

{¶ 104} As stated earlier, R.C. 4112.02(A) provide that it is an "unlawful discriminatory practice":

> For any employer, because of the **race**, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

---

law for persuasive guidance. *See State v. Sepeda*, 2020-Ohio-4167, ¶ 23 (6th Dist.); *State v. Gillispie*, 2012-Ohio-2942, ¶ 19-20 (2d Dist.).

14. We note that Adkins admitted that his behavior in connection with the Triple Moon incident was "undignified and unprofessional" and told city employees that he would accept whatever punishment the city council selected.

15. Because Adkins failed to establish a prima facie case of age or sex discrimination, there is no need to consider the second or third steps under the *McDonnell Douglas* framework. *McDonnell Douglas*, 411 U.S. at 802-803. However, we note that had we continued with the analysis, the record overwhelmingly supports the conclusion that Middletown had legitimate, nondiscriminatory reasons for Adkins' termination, as described previously. Nor does the record support the conclusion that Adkins' termination was pretextual.

(Emphasis added.) Race is one of nine protected categories listed in R.C. 4112.02(A), along with age and sex.

{¶ 105} Because Adkins is white, some courts refer to the alleged race discrimination claim in this case as "reverse discrimination"—that is, a situation in which an employer is discriminating against the majority race. *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985). In such cases, the United States Court of Appeals for the Sixth Circuit holds that the *first* prong of the prima facie case analysis under *McDonnell Douglas* is modified to require the plaintiff to establish that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Id.* If we were to apply this modified prima facie case, Adkins would be required to show (1) background circumstances supporting the inference that Middletown was the unusual employer who discriminated against non-minority employees, (2) that Middletown took an action adverse to Adkins' employment, (3) that Adkins was qualified for the position, and (4) that Middletown treated Adkins disparately from similarly situated minority employees. *Pohmer v. JPMorgan Chase Bank, N.A.*, 2015-Ohio-1229, ¶ 32 (10th Dist.), citing *Mowery v. Columbus*, 2006-Ohio-1153, ¶ 44 (10th Dist.), in turn citing *Thistledown* at 67. The "background circumstances" requirement imposes "a different and more difficult prima facie burden" on members of majority groups. *Briggs v. Potter*, 463 F.3d 507, 517 (6th Cir. 2006).

{¶ 106} Judge Kethledge, in a Sixth Circuit concurring opinion, recently noted that five federal circuit courts of appeals also apply a "background circumstances" version of the first prong in reverse discrimination cases, while "two circuits have expressly rejected this rule" and "five others simply do not apply it." *Ames v. Ohio Dept. of Youth Servs.*, 87

F.4th 822, 827-28 (6th Cir. 2023) (Kethledge, J., concurring, citing cases).[16]  Notably, the Equal Employment Opportunity Commission, tasked with addressing charges of discrimination and issuing guidance with regard to federal discrimination statutes, has rejected the "background circumstances" requirement in "reverse discrimination" cases and instead applies "the same standard of proof" regardless of a charging party's race. United States Equal Emp. Opportunity Comm., EEOC-CVG-2006-1, Section 15 Race & Color Discrimination, 15-II & n.23 (2006).

{¶ 107}  Upon our review, it appears that eight Ohio district courts of appeals apply the modified "background circumstances" version of the prima facie case analysis in reverse discrimination cases.  *Grooms v. Supporting Council of Preventative Effort*, 2004-Ohio-2034, ¶ 20 (2d Dist.); *Horsley v. Burton*, 2010-Ohio-6315, ¶ 75 (4th Dist.);  *Bellinger v. Weight Watchers Gourmet Food Co.*, 142 Ohio App.3d 708, 714 (5th Dist. 2001); *Girts v. Bostwick-Braun Co.*, 1998 WL 65491, *6 (6th Dist. Feb. 6, 1998) (reverse gender discrimination); *Carney v. Cleveland Heights-University City School Dist.*, 143 Ohio App.3d 415, 428 (8th Dist.2001); *Jones v. MTD Consumer Group, Inc.*, 2015-Ohio-1878, ¶ 27 (9th Dist.); *Pohmer*, 2015-Ohio-1229 at ¶ 32 (10th Dist.); *Butler v. Lubrizol Corp.*, 2015-Ohio-1216, ¶ 13 (11th Dist.).

{¶ 108}  It is therefore unsurprising that the trial court in this case also applied the "background circumstances" requirement to Adkins' race discrimination claim, given that Adkins claims he was discriminated against for being white.  However, we have been unable to locate any decision of the Ohio Supreme Court or of the Twelfth District holding

---

16. The United States Supreme Court granted a petition for writ of certiorari in *Ames*, and the case is currently pending before the Court.  *Ames v. Ohio Dept. of Youth Srvs.*, No. 23-1039 (2024).  Presumably the Supreme Court will soon resolve the split between federal circuits regarding whether the first prong of the prima facie case is modified to include the "background circumstances" requirement in "reverse discrimination" cases.  However, the Supreme Court's decision will not resolve the question before us regarding R.C. 4112.02.(A).

that the "background circumstances" requirement should be applied in cases of alleged reverse discrimination. Whether this version of the prima facie case applies is therefore a question of first impression for the Twelfth District, and there is no controlling authority with respect to R.C. 4112.02(A), the statute that we must apply. We must therefore determine the proper standard to apply in R.C. 4112.02(A) race discrimination claims involving "reverse discrimination" in this district.[17]

{¶ 109} We begin, as always, with the statutory text. *State v. Wallace*, 2024-Ohio-4955, ¶ 13 (12th Dist.); *State v. Pendergrass*, 2020-Ohio-3335, ¶ 5 ("In interpreting a statute, we begin with the statutory language"). A court's "duty in construing a statute is to determine and give effect to the intent of the General Assembly as expressed in the language it enacted." *Pelletier v. Campbell*, 2018-Ohio-2121, ¶ 14. The intention of the legislature is to be determined from the words used in the statute. *Caldwell v. Whirlpool Corp.*, 2024-Ohio-1625, ¶ 13. "Therefore, '[t]he question is not what did the general assembly intend to enact, but what is the meaning of that which it did enact.'" *Id.*, quoting *Slingluff v. Weaver*, 66 Ohio St. 621 (1902), paragraph two of the syllabus. In other words, in construing the words of a statute we are to determine the original public meaning of the actual words the General Assembly enacted and apply that meaning. *Pelletier* at ¶ 14; *Caldwell* at ¶ 13.

{¶ 110} Here, we see no support whatsoever in the text of R.C. 4112.02(A) for treating members of a racial majority differently from members of racial minorities when it comes to what a plaintiff is required to establish in a prima facie case. The text of the statute makes no distinction between majorities and minorities. R.C. 4112.02(A). In fact,

17. The parties assume, like the trial court, that the "background circumstances" analysis applies to R.C. 4112.02(A) reverse discrimination claims. But we cannot adopt a particular legal standard merely because the parties agree it is the correct standard when presented with an issue of first impression. It is for the judiciary, not the parties, to say what the law is. *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

the statute does not address groups at all, but applies instead to individuals. *Id.* (making it an unlawful discriminatory practice to impose an adverse employment action on "any person" on the basis of race).

{¶ 111} Further, there is no guidance in the text of R.C. 4112.02(A) for determining what individuals are members of a "minority" versus a "majority." Is a plaintiff a member of a racial "majority" and subject to the "background circumstances" requirement when a majority of the employees employed by the plaintiff's employer are a member of the plaintiff's race? Or is the racial composition of the city where the plaintiff is employed the determining factor? Or is it the county? The state? The United States? How are people who are biracial or multiracial to be considered when determining who is a member of a "majority" race? What happens when demographic trends over time change which race constitute a "majority" race? The "background circumstances" version of the prima facie case leaves these and other critical questions to the subjective whims of judges, inviting judicial lawmaking. While some courts have attempted to tackle these questions, their efforts do not change the fact that the text of R.C. 4112.02(A) is silent on these questions.

{¶ 112} If we were to adopt the "background circumstances" version of the prima facie case applied by the Sixth Circuit and our sister districts, we would be imposing requirements on some plaintiffs, but not others, that are not present in the text of the statute. We do not have the authority to impose this type of judge-made law. *Ohio Farmers Ins. Co. v. Heisel*, 143 Ohio St. 519, 522 (1944) ("the courts are without power to judicially legislate into the statute something clearly not placed there by the General Assembly.") That other courts have done so does not authorize us, as judges, to act as legislators.

{¶ 113} In any event, we fail to see how the General Assembly's use of neutral language in R.C. 4112.02(A)—language that refers to "any person" (rather than to

- 44 -

groups), that does not refer to majorities or minorities, and that does not make any distinction between the protections provided by the statute—could suggest that we should interpret the statute as requiring us to treat people differently based on their race when applying the *McDonnell Douglas* framework. In other words, an anti-discrimination statute should not induce us to discriminate between different racial groups by treating them differently. As Judge Kethledge stated, the application of the "background circumstances" requirement to Title VII "reverse discrimination" claims "is not a gloss upon" the statute, but "a deep scratch across its surface." *Ames,* 87 F.4th at 827 (Kethledge, J., concurring). "The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 748 (2007) (Roberts, C.J.).

{¶ 114} For these reasons, and unlike our sister districts that have addressed the issue, we reject the Sixth Circuit's "background circumstances" version of the prima facie case. We hold that the first prong of the *McDonnell Douglas* prima facie analysis—which asks whether a plaintiff has established that he or she is "a member of a statutorily-protected class"—applies to all plaintiffs asserting race discrimination claims, regardless of whether they are members of a racial majority or minority.

{¶ 115} Because we find that the trial court erred in applying the more onerous "background circumstances" requirement to Adkins' prima facie case, we must next determine whether Adkins established a prima facie case of racial discrimination under the same prima facie case analysis that we applied in our analysis of Adkins' age and sex discrimination claims above.

{¶ 116} This is a simple task. Our analysis with regard to Adkins' age and sex discrimination claims applies equally to his racial discrimination claim. Adkins has pointed to no summary judgment evidence that would allow him to establish a prima facie case

of race discrimination under the "replaced by . . . a person not belonging to the protected class" version of the analysis because Adkins was replaced by Palenick, who like Adkins is white. Likewise, he has pointed to no summary judgment evidence that would allow him to establish a prima facie case of race discrimination under the "circumstances that support an inference of discrimination" version of the prima facie case because he cannot establish that Vitori used city council as a "cat's paw" to discriminate on the basis of race. Likewise, Adkins has pointed to no evidence that would allow him to establish the cat's paw theory of liability.

{¶ 117} As such, Adkins has not pointed to any Civ.R. 56(C) evidence that would allow him to establish a case of race discrimination, and the trial court did not err in granting summary judgment in favor of Middletown on that claim.

{¶ 118} For the foregoing reasons, we overrule Adkins' first assignment of error.

### C. Retaliation Claim

{¶ 119} Adkins' second assignment of error states:

> THE TRIAL COURT ERRED BY GRANTING SUMMARY JUDGMENT IN FAVOR OF APPELLEE ON APPELLANT'S RETALIATION CLAIM.

{¶ 120} Adkins argues that the trial court erred in granting Middletown summary judgment on his retaliation claim because a reasonable factfinder could have concluded that Vitori influenced the other council members to terminate his employment after he complained about Vitori's harassing conduct.

### 1. Applicable Law and Analysis

{¶ 121} R.C. 4112.02(I) provides that it unlawful for

> any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, . . . or participated in any manner in any investigation, proceeding, or hearing under [R.C.]

4112.01 to 4112.07 . . . .

{¶ 122} In the absence of direct evidence, a plaintiff alleging retaliation must establish a prima facie case using indirect evidence, by demonstrating that,

> (1) he or she engaged in a protected activity, (2) the employer was aware that the plaintiff had engaged in that activity, (3) the employer took an adverse employment action against the plaintiff, and (4) there is a causal connection between the protected activity and adverse action.

*Sullivan v. IKEA*, 2020-Ohio-6661, ¶ 23 (12th Dist.).

{¶ 123} In his complaint, Adkins alleged that he engaged in protected activity by complaining of discrimination, but did not specify precisely when or how this protected activity occurred. In his deposition, Adkins testified he engaged in protected activity when he made his comments during the pre-disciplinary hearing. Specifically, he points to his statement to city council that:

> I have to ask the question as to what strong motivation would [Vitori] still have to orchestrate these events. The only answer I can come up with is that she wanted to continue her barrage against me and saw this as an opportunity to drive me out of the position of City Manager completely . . . She succeeded in doing something that no one has been able to accomplish in 14+ years. She got under my skin and unnerved me. Given the work record I've gone through above, I can't believe that this is related to my work product. It must be more personal. **I can only speculate. Perhaps she doesn't like older white men. Perhaps she believes that people who need hearing aids are not qualified to run a city.**

(Emphasis added.) Adkins' statement at the executive session was that Vitori held a personal animus towards him, and a vague assertion that her animus was "perhaps" because she did not like "older white men" or "people who need hearing aids." He qualified this statement by explaining that "I can only speculate."

{¶ 124} It is well established that a vague charge of discrimination is insufficient to constitute opposition to an unlawful employment practice. *Sullivan* at ¶ 27, citing *Fox v.*

*Eagle Distrib. Co.*, 510 F.3d 587 (6th Cir. 2007); *Balding-Margolis v. Cleveland Arcade*, 352 Fed.Appx. 35 (6th Cir. 2009); *Springs v. Cincinnati Children's Hosp. Med. Ctr.*, 2012 WL 1354475 (S.D. Ohio Apr. 17, 2012).

{¶ 125} Adkins' statement was given during his pre-disciplinary hearing regarding the Triple Moon incident. The statement was defensive, i.e., explaining his behavior by deflecting blame on Vitori. It is somewhat of a stretch to review that statement as a whole and understand that Adkins was complaining that Vitori was engaging in unlawful discriminatory workplace practices. Instead, it appears that Adkins was complaining that Vitori was interfering with the performance of his job by inserting herself into his administrative role, rather than limiting herself to her proper role of setting city policy. She allegedly did this by e-mailing him about city matters at all hours and engaging in "chippy" e-mail exchanges with him about city matters. Adkins claimed that Vitori's behavior caused him unnecessary stress, which resulted in him reaching a "breaking point," thus explaining his behavior at Triple Moon.

{¶ 126} Adkins admitted in his deposition that Vitori only contacted him concerning city matters. Other than the brief assertion that Vitori's personal animus towards him was "maybe" due to his age and race—which Adkins admitted was speculative—there is very little in Adkins' lengthy statement to the council that would reasonably notify Middletown that Adkins was complaining of discriminatory workplace practices.

{¶ 127} Moreover, Adkins testified in his deposition that he was aware of Middletown's formal policy for filing complaints about discriminatory workplace practices. Yet he admitted he filed no formal complaint. While the law does not require "formal" notice to the employer, the fact that Adkins was aware of this policy potentially underscores the fact that he was not using his pre-disciplinary hearing comments to put the city on notice of discriminatory conduct.

{¶ 128} Regardless, because the law requires us to construe all facts in the nonmovants' favor, we will assume that Adkins' comments at the pre-disciplinary hearing were sufficient to establish protected activity under R.C. Chapter 4112. Thus Adkins pointed to evidence that would establish the first prong of a prima facie case of retaliation. We will also assume he established the second prong because council members heard him make the comments that we assume were protected activity. And he clearly established the third prong because his termination was an adverse employment action.

{¶ 129} However, Adkins has not pointed to any evidence establishing a causal connection between his complaint at the pre-disciplinary hearing and his termination. Even if Vitori's vote to terminate Adkins was retaliatory, as described above, the other four council members explained their reasoning for terminating Adkins' employment, and none of these reasons had a causal connection to Adkins' comments at the pre-disciplinary hearing.

{¶ 130} In his appellate brief, Adkins argues the "cat's paw" theory, and states that because he has established that because Vitori harbored a discriminatory bias against white, older men and was antagonistic towards him personally, it should be inferred that Vitori influenced the other members of city council to illegally retaliate against him for making his complaint about Vitori during the hearing. But for the same reasons that we found above—that Adkins failed to provide evidence establishing that Vitori used and influenced city council as a cat's paw to discriminate against Adkins— we find that Adkins offered no such evidence with regard to his retaliation claim.

### 2. Pretext

{¶ 131} In his final argument in support of his second assignment of error, Adkins argues that because he established a prima facie case of retaliation, then the burden shifted to Middletown to establish a non-discriminatory justification for his firing. In sum,

Adkins argues that the Triple Moon incident was a pretextual excuse for his firing, and points out that he had already been disciplined for the Triple Moon incident prior to his termination at the November 2019 council meeting.

{¶ 132} However, because we have already decided that Adkins *has not* established a prima facie case of retaliation, we need not consider his pretext argument. *Paranthaman v. State Auto Property & Cas. Ins. Co.*, 2014-Ohio-4948, ¶ 52 (holding that the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for its employment action only if the plaintiff successfully establishes a prima facie case). We overrule Adkins' second assignment of error.

### III. Conclusion

{¶ 133} The trial court did not err in granting summary judgment in favor of Middletown. Adkins failed to establish a prima facie case of age, sex, or race discrimination. Furthermore, Adkins failed to establish a prima facie case of retaliation for engaging in protected activity.

{¶ 134} Judgment affirmed.

S. POWELL, P.J., and M. POWELL, J., concur.